UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CRIMINAL ACTION NO. 4:17-CR-00012-GNS-CHL

UNITED STATES OF AMERICA                                    PLAINTIFF

v.

RICHARD G. MAIKE et al.                                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motions for New Trial (DN 847, 856), and Defendant's Motion for Leave to Seal (DN 848).  The motions are ripe for adjudication.

### I.   BACKGROUND

In 2022, a federal jury convicted Defendants Richard G. Maike ("Maike"), Doyce Barnes, and Faraday Hosseinipour ("Hosseinipour") following a lengthy multi-week trial related to a multi-level marketing ("MLM") scheme known as I2G.  (Jury Verdict, DN 1-3).  The jury convicted Maike of one count of conspiracy to commit mail fraud, nine counts of money laundering, two counts of tax evasion, and one count of securities fraud.  (Jury Verdict 1-13).  As to Hosseinipour, the jury convicted her of one count of conspiracy to commit mail fraud and one count of securities fraud.  (Jury Verdict 1-2).

On appeal, the Sixth Circuit upheld their convictions.  *See United States v. Maike*, 142 F.4th 367, 379 (6th Cir. 2025).  The Sixth Circuit, however, remanded the matter for further consideration of Hosseinipour's motion for a new trial (DN 578).  *See Maike*, 142 F.4th at 379. Hosseinipour subsequently petitioned for a writ of certiorari from the U.S. Supreme Court, which was denied.  (U.S. Supreme Court Letter, DN 862).

Maike and Hosseinipour have now moved for a new trial pursuant to Fed. R. Crim. P. 33(b)(1). (Def.'s Mot. New Trial, DN 847 [hereinafter Maike's Mot.]; Def.'s Mot. New. Trial, DN 856 [hereinafter Hosseinipour's Mot.]. The United States opposes the motions. (Pl.'s Resp. Def.'s Mot. New Trial, DN 853 [hereinafter Pl.'s Resp. Maike's Mot.]; Pl.'s Resp. Def.'s Mot. New Trial, DN 859 [hereinafter Pl.'s Resp. Hosseinipour's Mot.]). Hosseinipour has also moved for leave to seal her motion to set an evidentiary hearing on her initial motion for a new trial.[1] (Def.'s Mot. Leave Seal, DN 848). While both Maike and Hosseinipour request an evidentiary hearing, such a hearing is unnecessary to address the issues raised.

## II.    DISCUSSION

### A.    Defendants' Motions for New Trial

In relevant part, Fed. R. Crim. P. 33 provides that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). The burden is on the defendant to justify a new trial. *See United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009); *see also United States v. Dhaliwal*, No. 1:08-CR-119-2, 2013 WL 664902, at *6 (W.D. Mich. Feb. 22, 2013) (citing *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994)) (stating that the defendants bear the burden to show entitlement to a new trial regardless of whether the motion is based upon Fed. R. Crim. P. 33 or a *Brady* violation). The decision to grant or deny a motion for a new trial is entirely within the discretion of the district court, and [the Sixth Circuit] will not reverse absent a showing of an abuse of discretion." *United States v. Anderson*, 76 F.3d 685, 692 (6th Cir. 1996); *see also United States v. Farrad*, 895 F.3d 859, 885 (6th Cir. 2018); *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015). "[S]uch motions should be granted sparingly and with caution." *United States v.*

---

[1] Hosseinipour's initial motion (DN 578) regarding ineffective assistance of trial counsel will be addressed separately from this Memorandum Opinion and Order.

*Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993); *see also United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (Rule 33 motions "are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." (citation and quotation omitted)); *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986) ("Motions for a new trial based on newly discovered evidence are disfavored . . . ." (citation omitted)).

### 1. Brady *Violation*

"The *Brady* rule requires that the prosecution disclose all exculpatory and impeachment evidence that is in the government's possession 'in time for use at trial.'" *United States v. Burks*, 542 F. Supp. 3d 737, 744 (M.D. Tenn. 2021) (quoting *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988)). "*Brady*'s ultimate concern for ensuring that criminal defendants receive a 'fundamentally fair' trial . . . ." *Moldowan v. City of Warren*, 578 F.3d 351, 378 (6th Cir. 2009) (citing *United States v. Bagley*, 473 U.S. 667, 675 (1985)).

"*Brady* violations have three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] the evidence must have been suppressed by the State, either willfully or inadvertently, and [3] prejudice must have ensued.'" *United States v. Hanna*, 661 F.3d 271, 296 (6th Cir. 2011) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "The defendant's burden [in moving for a new trial] is less rigorous if the new evidence is exculpatory evidence which the government failed to turn over in violation of the requirements of *Brady* . . . ." *United States v. Knapp*, No. 1:05-CR-172, 2005 WL 3440806, at *3 (W.D. Mich. Dec. 14, 2005) (citing *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997)).

### a.      Favorable to Defendant

First, Maike and Hosseinipour must prove that the evidence at issue was material and would have impacted whether they were acquitted or convicted. *See Hanna*, 61 F.3d at 296 (citation omitted). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011) (alteration in original) (quoting *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)). "Favorable evidence is material if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Cone*, 556 U.S. at 470). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Hanna*, 661 F.3d at 296 (quoting *United States v. Agurs*, 427 U.S. 97, 109 (1976).

In this instance, the alleged *Brady* violation is based upon data from the database of Jerry Reynolds ("Reynolds"), who is a software architect and whose businesses—including Trinity Software ("Trinity")—provided services to MLM endeavors. (Reynolds Trial Tr. vol. 1, 3:16-17, DN 497). Trinity "offer[s] a software package that specifically addresses the needs of MLM and networking marketing companies, so [it] provide[s] software for the corporate side of it and for the field to use." (Reynolds Trial Tr. vol. 1, 3:19-22). This software tracks numerous items, including "[e]nrollments, orders, [and] financial transactions that go with those . . . ." (Reynolds Trial Tr. vol. 1, 4:4-5). Because the software did not issue checks, Trinity would send instructions to another company to issue checks or credit an account. (Reynolds Trial Tr. vol. 2, 43:17-21, DN 498).

4

Reynolds, Maike, and Maike's wife, Angela, had known each other for decades, considered themselves friends, and had previously worked together when Maike was involved with a gourmet food MLM company.  (Reynolds Trial Tr. vol. 2, 95:5-13, 99:16-19, DN 498).  At some point, Maike requested that Reynolds develop software to calculate commissions owed based on a compensation plan.  (Reynolds Trial Tr. vol. 2, 95:14-19).  The software was called Firestorm, and it was used by Maike for some of his companies, including I2G.  (Reynolds Trial Tr. vol. 2, 97:5-98:2, 139:3-7).

Prior to trial, the United States subpoenaed specific data from the database for I2G maintained by Reynolds that was produced in Excel spreadsheets, and the United States has represented that it turned over all spreadsheets it received to Defendants.  (Jury Trial Tr. vol. 4, 34:21-25, DN 681).  This included Exhibit 101-I, which was titled "Participant Gail-Loss" with each of the thousands of rows containing a unique "DealerID" assigned for each person in the system, and this spreadsheet was provided by Reynolds.  (Pl.'s Resp. Maike's Mot. New Trial 2, DN 850 (citing Pl.'s Trial Ex. 101-I, DN 654-3); Keep Trial Tr. vol. 2, 38:6-21, DN 487).  During his direct examination, Reynolds explained the various fields appearing in that spreadsheet. (Reynolds Trial Tr. vol 2, 80:21-91:11).  As to column P labelled "Value Checks Requested and Paid," Reynolds testified that it represented "basically how much commission [participants] were paid.  We took that number and subtracted it from what they paid to enroll and came up with, in this case, a negative number."  (Reynolds Trial Tr. vol. 2, 87:14-18).  The United States contends that Exhibit 101-I shows that 96% of the values in the "Gain_Loss" column of that spreadsheet showing commissions paid are negative numbers.  (Pl.'s Resp. Maike's Mot. New Trial 2 (citing Pl.'s Trial Ex. 101-I)).

At trial, Dr. William Keep ("Dr. Keep"), a professor of marketing at the College of New Jersey, was called as an expert witness during the United States' case-in-chief.  (Keep Trial Tr. vol. 1, 3:7-12, DN 486).  Based on his review of Exhibit 101-I, he testified that "96 percent of all positions and all accounts associated with e-mails were in a loss position."  (Keep Trial Tr. vol. 2, 39:15-17, 139:2-15, DN 487).

In support of the alleged *Brady* violation, Maike and Hosseinipour assert that the database contains newly discovered evidence reflecting that approximately 37% of participants made money.  (Maike's Mot. 3-7; Hosseinipour's Mot. 11, 20-21).  They rely upon a declaration of Reynolds dated September 5, 2025, in which he stated:

> 5.      On August 20 and August 25, 2025, I spoke with Mr. Kyle Singhal, Rick Maike's attorney.  We discussed the Sixth Circuit's affirmance of Rick's convictions.  Mr. Singhal shared with me that the court based its ruling in part on the government's representation that the Backoffice Solutions data, which I had provided, showed that 96% of I2G participants had lost money.
> 6.      On August 28, 2025, I shared some data with Mr. Singhal on a Zoom call.  I had run a query to determine what percentage of I2G accounts had made money.  The answer, as I showed Mr. Singhal on the Zoom call, was 7.206068%.
> 7.      I had run a query to determine what percentage of I2G participants (meaning, individual humans, rather than accounts) had made money.  The answer, as I showed Mr. Singhal on the Zoom call, was 37.432043%.

(Reynolds Decl. ¶¶ 5-7, Sep. 5, 2025, DN 847-2).

In asserting that she has proof of new evidence in the present motion, Hosseinipour tendered three spreadsheets, which are discussed below.  While it is unclear who created these spreadsheets, Hosseinipour has stated:

> [A] spreadsheet and chart were created reflecting information contained in Exhibit 1 compared to information contained in 101-i.  Exhibit 2 is a true and correct comparison of the actual commissions of Pepito, Ja Jeong, and Kim, among others, as shown in Exhibit 1 compared to the commissions shown in 101-i.  The bar chart graphically showing a comparison of Pepito, Ja Jeong, and Kim's commissions is included in the motion.

(Hosseinipour Decl. ¶ 14, DN 856-2).

Hosseinipour's Exhibit 1 is labelled "Raw Commission Data", and she asserts that: (i) she first learned of this data as a result of Reynolds' affidavit; (ii) she was unaware until then "that more than 37% of i2g participants made money from i2g and that the Government had this information in its possession at trial"; and (iii) she only recently learned that the United States could have run queries to ascertain "which participants made money and which did not" before trial but failed to disclose this ability to her. (Hosseinipour Decl. ¶¶ 4-7, 23-24; Hosseinipour's Mot. 11 (internal citations omitted) (citation omitted)). As the United States notes, this exhibit includes data was provided to Defendants in 2017 as part of "Backoffice Enterprise Solutions: CommissionDetail" (USA-007241). (Pl.'s Resp. Hosseinipour's Mot. 5). "The two spreadsheets are slightly different: 'CommissionDetail' only includes data through August 2015, because the subpoena was issued in August 2015. 'Raw Commission Data' adds data through December of 2019, totaling about $1 million more in commissions. These additional four years fall well outside the conduct charged in the indictment." (Pl.'s Resp. Hosseinipour's Mot. 5-6 (internal citations omitted) (citation omitted)). Therefore, Hosseinipour has not shown that Exhibit 1 is new evidence.

Her Exhibit 2 is labelled "Certain Alleged Victims in Indictment and Jury Instructions." (Hosseinipour Decl. Ex. 2, at 1, DN 856-4). Besides listing the names of ten victims of the scheme, the exhibit also contains columns for: (i) Commissions on Exhibit 101-I; (ii) Actual Commissions; (iii) Difference in Actual Commissions versus 101-I; (iv) Loss Reported on Exhibit 101-I; and (v) Gain or Loss Comparing Actual Commissions and Expenditures Shown on Exhibit 101-I. (Hosseinipour Decl. Ex. 1, at 1). Based on Exhibit 2, Hosseinipour asserts only one of these ten victims suffered a financial loss. (Hosseinipour Decl. Ex. 1, at 1). As the United

States asserted in its response, however, this exhibit contains no new data because "Actual Commissions" is taken from her Exhibit 1, which is not new, as noted above, and includes data outside the scope of the Indictment.

Finally, Exhibit 3 is labelled "Hosseinipour's Team Members." It lists sixteen persons who are noted as "distributors," and it has four other columns: (i) Commissions on 101; (ii) Actual Commissions; (iii) Percentage of Commissions Excluded from 101-I; and (iv) Gain or Loss Comparing Actual Commissions Versus Exhibit 101-I Expenditures. (Hosseinipour Decl. Ex. 3, at 1, DN 856-5). Hosseinipour claims that Exhibit 3 supports her assertion that the United States filtered out $750,000 in earnings for those sixteen participants, and these participants had actually made over $1.2 million without any loss. (Hosseinipour's Mot. 9 (citing Hosseinipour Decl. ¶¶ 16-18; Hosseinipour Decl. Ex. 3, at 1, DN 856-5)). Like Exhibit 2, this exhibit is also not new because the "Actual Commissions" data comes from Exhibit 1. Like her Exhibit 2, Exhibit 3 does not provide new data and contains data beyond the scope of the Indictment.

The United States' response to Hosseinipour's motion contains an omnibus table based upon the columns "ValueChecksRequestedAndPaid" from Exhibit 101-I (DN 656), "Global Pay Records" from USA-002319.xlsx (DN 656), and "Raw Commission Data" from Exhibit 1 (Excel spreadsheet) to Hosseinipour's Declaration (DN 857).[2] Besides corroborating the data in Exhibit 101-I, the United States contends that "Hosseinipour's 'new evidence' merely show[s] what she already knew or could have easily calculated: commissions *earned* (the last column) were much greater than the commissions *paid* (the last two columns)." (Pl.'s Resp. Hosseinipour's Mot. 10 (alteration in original)). In addition, the United States asserts that the accuracy of the data

---

[2] The United States notes that "[t]he first, second, and fourth columns [from its omnibus table] [were] copied exactly from Hosseinipour's Exhibits 2 and 3; the third column is taken from Global Payroll records." (Pl.'s Resp. Hosseinipour's Mot. 9 (internal footnote omitted)).

regarding Queyenne Pepito was addressed by the Court in ordering restitution for this victim in the amount of $194,567.[3]  (Pl.'s Resp. Hosseinipour's Mot. 10 (citing Order 19, DN 744)).

The newly discovered evidence identified by both Maike and Hosseinipour is consistent with what the Sixth Circuit acknowledged—Exhibit 101-I "might overstate how many participants lost money."  *Maike*, 2025 WL 1770555, at *6.  The United States relied upon the commissions paid to participants to show their losses, rather than commission earned or accrued. For the reasons outlined above, however, this information is not new and therefore does not provide a basis for a new trial.

### b.        Suppressed by the United States

Maike and Hosseinipour must also prove that the United States suppressed the evidence from the database.  *See Hanna*, 661 F.3d at 296 (citation omitted).  "*Brady* 'does not apply to information that is not wholly within the control of the prosecution.'"  *United States v. Henderson*, 338 F. Supp. 3d 673, 688 (N.D. Ohio 2018) (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)).  Therefore, "there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source."  *Id.* (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).

When Dr. Keep testified on the third day of trial, there was limited cross-examination of him regarding Exhibit 101-I.  This included Maike's counsel inquiring whether Dr. Keep's "analysis of gain or loss [he] talked about essentially disregard[ed] or discount[ed] any value to the Touch . . . ."  (Keep Trial Tr. vol. 2, 99:14-15, DN 487).  In addition, Hosseinipour's counsel

---

[3] The imposition of restitution was affirmed on appeal.  *See Maike*, 2025 WL 1770555, at *9.

inquired about the number of participants who had lost money, and Dr. Keep testified as follows

regarding his review of Exhibit 101-I:

> Q.    Now, but in your analysis, would you count each one of these lines as a person?
> A.    . . . So I did two things.  I just looked at this number.  If you sort this chart by gains and losses, placing all your gains at the top, which will result also with a whole bunch of zero—didn't gain; didn't lose—and then a whole bunch of negatives and you just simply divide the number of rows that are negative by the total number of rows, you're going to get 96 percent.
> If you aggregate this data by e-mail—and that means, like in this case that you have here, if you have all of these with Mr. Syn, all of these accounts—some accounts made money; some accounts didn't make money.  If you squish all that together, it will end up telling you in the end did all of—the accounts associated with this e-mail, were they positive, or were they—did it end up positive or negative.  Ended up with the same 96 percent.
> Q.    Treating them as individuals and treating them all together, you'd still come up with 96 percent?
> A.    Individual e-mails and individual positions.

(Keep Trial Tr. vol. 2, 137:4-139:18).

On the fourth day of trial (July 14, 2022), the United States called Reynolds as part of its case-in-chief.  In the afternoon of that day, Maike's attorneys advised the Court of their efforts to obtain the data from Reynolds' database relating to I2G.  (Trial Tr. vol 4, 19:8-45:16, DN 681).  During that lengthy colloquy, Maike's counsel indicated that they had requested "[a] fully functional version of the Firestorm MLM system previously licensed to I2G loaded with the I2G database accessible online for effective use at trial" in May 2022.  (Trial Tr. vol. 4, 21:14-20).  While Maike was willing to pay a $3,500 licensing fee for the system, it had not yet been produced due to an apparent misunderstanding with Reynolds' counsel and a concern that the data could be manipulated.  (Trial Tr. vol. 4, 21:21-23:7).  Maike's counsel then requested a read-only version of the data, and during the colloquy, counsel requested that the Court enforce the subpoena.  (Trial Tr. vol. 4, 23:7-14).  The following exchange occurred:

10

> THE COURT: I just don't understand why I'm just hearing about this at 2:30 on Friday afternoon of our first week of trial. That's kind of the puzzle.
>
> MR. WISENBERG: Your Honor, let me explain.
>
> THE COURT: If I seem a little testy.
>
> MR. WISENBERG: I understand. And I took that risk. I didn't know—the date on this original subpoena was the first day of trial. We were still negotiating about this, and I didn't know if I—I didn't know—I didn't know if there was any particular hostility by Mr. Reynolds. I didn't know what his testimony would be, and I thought it might be necessary for me to question him about it in front of the jury, which is why yesterday I asked, you know, when the government gave him his assignment that it be done in front of the jury. And so that's all. I never—I always believe in bringing these matters to the Court, but I felt it was something that might be very critical to his cross-examination and it wasn't necessary.
>
> But the real issue is I don't understand why we don't have it. I understand if somebody is concerned about the integrity of their data. My understanding—I could be wrong. My understanding is that a version can be created or a remote server can be created where nobody can manipulate and change data so that Mr. Reynolds would not be accused of something improper. I think that's the concern, that if something we get doesn't match a government printout that he could be to blame for it. That's all.
>
> Logistically, this will not be a problem. It's my understanding it can be done in about 24, 36 hours. That's all.

(Trial Tr. vol. 4, 24:1-25:3). Maike's counsel further noted that "this was subpoenaed in ample time for trial, and I was talking to his lawyer about it. I've been asking for it for a long time, and I asked for it formally by e-mail in May. (Trial Tr. vol. 4, 30:18-21). The Court ordered Reynolds' counsel to provide a read-only copy of Backoffice to defense counsel in a reasonable form upon payment of the agreed price. (Trial Tr. vol. 4, 37:24-38:2). Reynolds' attorney also provided to access to the United States approximately two weeks later. (Pl.'s Resp. Def.'s Mot. New Trial Ex. 1, at 1-2, DN 850-1). The record thus reflects that defense counsel had access to the database during the lengthy trial, which did not end until September 7, 2022.

Maike and Hosseinipour now assert that the static version of the data provided to defense counsel did not allow them to conduct the "free-form queries" to ascertain the percentage of participate who made money. (Maike's Mot. 8 (quoting Reynolds Decl. ¶ 10, Sep. 5, 2025);

11

Hosseinipour's Mot. 11 (citing Reynolds Decl. ¶ 10, Sep. 5, 2025)).    Post-trial, Maike and

Hosseinipour claim to have learned that Reynolds provided an "instance" version of the

BackOffice Enterprise Solutions database to the United States prior to trial, which permitted the

United States "to use the Firestorm application to review the data."  (Reynolds Decl. ¶ 4, Sep. 5,

2025).  This assertion appears to be in conflict with the following statement from Reynolds' first

declaration:

> Attorneys for the Defendants have sent me US-7240, a spreadsheet that I provided
> to the United States during the course of this investigation.  7240 has metadata
> that shows it was created by me on 9/9/15.  The United States apparently
> produced this spreadsheet to all defendants in 2017 and titled it "Backoffice
> Enterprise Solutions:  Checks.xlsx."

(Reynolds Decl. 1, Apr. 6, 2023, DN 856-1).  At trial, Reynolds also testified:

> Q.      Do you recall receiving a request from the United States to provide data
> on all the participants' gain and loss?
> A.      I do.
> Q.      Okay.  And did you provide this spreadsheet because of that request?
> A.      Yes.
> Q.      And does this have I2G records that show all the participants' gain and
> loss data that was tracked by your system?
> A.      Yes.
> Q.      Now, if there was data by your system—or if there was payments, like, by
> your system—example we gave earlier, that I2G writes a check to someone and
> they don't have to tell you about that, that would not be tracked by this?
> A.      It would not.
> Q.      So this is just the gain and loss that was tracked by your system?
> A.      Correct.
> Q.      For all the participants in I2G?
> A.      Yes.
> . . .
>         MR. SEWELL:  Okay.  Can you pull up Exhibit 101-I for Mr. Reynolds?
> BY MR. SEWELL:
> Q.      Mr. Reynolds, do you recall the United States requesting information from
> your database regarding participant gain/loss?
> A.      Yes.
> Q.      And looking at Exhibit 101-I, is this the data that you provided pursuant to
> that request?
> A.      Can you scroll to the right so I can see the last couple columns?
>         Yes.

12

Q.      Okay.  And this is the data that your system tracked?
A.      Yes.

(Reynolds Trial Tr. vol. 2, 79:19-81:8).  This testimony is also consistent with the United States'

representation to the Court prior to Reynold's testimony that that the subpoenaed data had been

provided in Excel spreadsheets and shared with defense counsel.  (Trial Tr. vol. 4, 34:21-25, DN

681).

The Court is skeptical of Reynolds' declaration, which calls into question his own trial

testimony.  Nevertheless, neither Maike and Hosseinipour have alleged nor can they show that

the United States possessed the additional data from the database upon which the alleged *Brady*

violation is based.  Their unsupported assertions that efforts to communicate were stymied

because Reynolds or his businesses had retained counsel is unpersuasive.  In light of the Maikes'

long-standing relationship with Reynolds, it seems implausible that Reynolds or his businesses

would have not cooperated with Defendants.  The record also reflects the efforts of defense

counsel to obtain access to the database prior to trial and confirmed that access was granted

during the lengthy trial.

Hosseinipour also asserts that the United States instructed Reynolds to filter out $28

million in commissions.  (Hosseinipour's Mot. 11-12, 15-16; Hosseinipour's Reply 2, 6, 8-9, 12).

In particular, she contends:

> Based on a conversation with Reynolds after trial along with a spreadsheet that he
> provided, Hosseinipour learned that Reynolds' system showed each of these
> individuals—along with 7,000 other participants who were represented as net
> losers on 101-i—actually gained money.  The Government had Reynolds filter out
> commissions earned by these individuals, and the Government suppressed this
> information from Hosseinipour.

(Hosseinipour's Mot. 12).  In making this assertion, Hosseinipour cites to no evidence in the

record to support the existence of such an instruction or that the United States "knew that

13

substantial earnings had been filtered out of 101-I"; rather, she instead relies upon the difference between commissions actually paid and commissions "earned." (Hosseinipour's Mot. 16). As discussed above, Reynolds testified how the column for commissions paid was calculated in Exhibit 101-I, which was an Excel spreadsheet he had created from the database containing data for I2G. As the Sixth Circuit noted, "the defendants had ample opportunity to cross-examine both Keep and Reynolds about anything that the spreadsheets contained." *Maike*, 2025 WL 1770555, at *6 (citation omitted). At best, Reynolds' first post-trial declaration confirms that there were additional commissions *earned* which, if included, would have reduced the percentage of participants who lost money. At trial, however, Reynolds testified regarding the amounts of commission *paid* to participants, as reflected in Exhibition 101-I.[4] (Reynolds Trial Tr. vol. 2, 87:14-18).

Therefore, Maike and Hosseinipour have not shown the United States suppressed evidence that was both unknown to them and not available from another source.

### c.    Resulting Prejudice

Finally, Maike and Hosseinipour must show that they were prejudiced due to the United States' failure to disclose evidence. *See Hanna*, 661 F.3d at 296 (citation omitted). In particular, they contend that the new evidence reflects that less than 63% of the I2G participants lost money, rather than the 96% figure relied upon by the United States at trial. (Maike's Mot. 9-10; Hosseinipour's Mot. 1, 21). Therefore, they view the new evidence as being material and impacting the result of the jury trial.

---

[4] The paper earnings would have meant nothing to the victims of the scheme. For example, a participant investing $5,000 who had commissions earned of $10,000 but commissions paid of only $1,000 would still have lost $4,000.

In her motion, Hosseinipour asserts that this new evidence undermines the testimony of Dr. Keep. (Hosseinipour's Mot. 16). In particular, Dr. Keep testified:

> Q.      . . . Have you studied the percentage of people in multi-level marketing companies that end up not making money during the time that they're a part of the company?
> A.      I have made estimates. This is a notoriously non-transparent industry. Very, very hard to get company data. So I have made estimates based on some of the publicly available data, but they're estimates because I haven't been able to get their actual data.
> Q.      And based on those estimates, what did you determine?
> A.      Based on those estimates, I would say easily in the high 80s percentage. 85 to 90 percentage of all people who participate in multi-level marketing companies will end up in a loss position.
> . . .
> Q. . . . But based on—without that understanding, your general impression of the MLM industry as a whole, both legitimate and illegitimate MLMs, is that roughly 85 to 90 percent of people end up in a loss position? That's just inherent to the nature of MLMs; right?
> A.      I want to agree with everything except that very last part of your sentence.

(Keep Trial Tr. vol. 2, 87:10-22, 88:6-12). She also points to an article published by the Consumer Awareness Institute summarizing a study of MLM programs, which reflects that about 99.6% of participants lost money. (Hosseinipour's Mot. 16 n.2 (citing Jon. M. Taylor, The Case (for and) against Multi-level Marketing, Consumer Awareness Inst. (2011), https://www.ftc.gov/sites/default/files/documents/public_comments/trade-regulation-rule-disclos ure-requirements-and-prohibitions-concerning-business-opportunities-ftc.r511993-00017%C2% A0/00017-57317.pdf)).

This new evidence that less than 63% of participants in I2G lost money, however, would still "support[] an inference that [the scheme] was fraudulent, rather than . . . just star-crossed." *Maike*, 142 F.4th at 375. A jury could still infer that "not only that these defendants knowingly and voluntarily agreed to participate in a fraudulent scheme—namely a pyramid scheme—but that they actually did so, thereby obtaining millions of dollars in profits for themselves." *Id.*

15

Therefore, whether the proof is 96% or less than 63% of the participants lost money in the scheme where the organizers earned millions of dollars, neither Maike nor Hosseinipour has shown that there was a reasonable probability of a different result at trial and have failed to show prejudice.

For these reasons, Maike and Hosseinipour have failed to prove that they are entitled to a new trial based upon a *Brady* violation.  Their motions are denied on this basis.

### 2. *False Evidence*

Hosseinipour also contends that the United States presented false evidence at trial. (Hosseinipour's Mot. 8-9; Def.'s Reply Mot. New Trial 8-10, DN 860 [hereinafter Hosseinipour's Reply]).  In particular, she assets that "the Government intentionally misled the jury about what Reynolds' database shows, withheld the instructions it provided Reynolds in creating 101-i, and instructed Keep to use 101-i to opine that almost everyone at i2g lost money." (Hosseinipour's Reply 9-10; *see also* Hosseinipour's Mot. 8 ("Hosseinpour first learned of the contents of this declaration after it was filed. Reynolds' second declaration revealed that Reynolds' database, when not manipulated like it was to create 101-i, actually reflected that 37% of participants made money. The only reason that 101-i did not reflect this is that the Government instructed Reynolds to exclude certain earnings from 101-i.")).  She also maintains that the United States misrepresented internal fund transfers as losses.  (Hosseinipour's Reply 10).  In particular, she asserts that the United States directed "Reynolds to filter out more than $28 million in commissions and over 37% of i2g participants made money."  (Hosseinipour's Mot. 7, 11).

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court articulated the proposition that a prosecutor may not deceive a court and jurors through the presentation of

known false evidence.  *See Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009).  "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'"  *Carter v. Mitchell*, 443 F.3d 517, 535 (6th Cir. 2006) (quoting *Giglio*, 405 U.S. at 154).

On appeal, both Hosseinipour and a co-defendant asserted that the United States improperly introduced false evidence.  *See Maike*, 2025 WL 1770555, at *6.  In affirming their convictions and rejecting that argument, the Sixth Circuit stated:

> Here, the defendants contend that testimony based on Exhibit 101i—a spreadsheet containing I2G participants' earnings and losses—was false.  That spreadsheet provided the basis for the government's expert witness, William Keep, to testify that 96 percent of I2G's distributors lost money.  But the government elicited testimony from a computer programmer who compiled the spreadsheet, Jerry Reynolds, about the spreadsheet's limitations.  Specifically, Reynolds testified about the very deficiency to which the defendants point:  that the spreadsheet might not have included every payment that I2G made to participants, so it might overstate how many participants lost money.  Moreover, the defendants had ample opportunity to cross-examine both Keep and Reynolds about anything that the spreadsheets contained.

*Id.* (citing *United States v. Ward*, 190 F.3d 483, 491 (6th Cir. 1999)).

In asserting that she has proof of new evidence in the present motion, Hosseinipour tendered the three spreadsheets discussed above.  The Sixth Circuit recognized that the evidence at trial (in particular, Exhibit 101-I), "might overstate how many participants lost money." *Maike*, 2025 WL 1770555, at *6.  Hosseinipour's assertion that the United States intentionally misled the jury by somehow creating the data used at trial ignores Reynolds' own trial testimony under oath that he provided spreadsheets to the United States—including Exhibit 101-I— containing data on the gains and losses of the I2G participants used to calculate the commissions paid.  (Reynolds Trial Tr. vol. 2, 79:19-81:8).  Overall, Hosseinipour has failed to show any false evidence presented by the United States.  Her belief that the United States should not have used

17

commissions actually paid to prove the extent of the loss by I2G participants is not proof of false evidence.

For these reasons, Hosseinipour has failed to provide sufficient evidence to support relief based upon false evidence.  In addition, as discussed herein, the Hosseinipour has not shown that proof that 37% of participants made money would have likely produced an acquittal.  Her motion is denied on this basis.

### 3.    *Fed. R. Crim. P. 33(b)(1)*

Finally, Maike and Hosseinipour seek a new trial pursuant to Fed. R. Crim. P. 33(b)(1). *See United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986).  To obtain such relief, a defendant must show:  "(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal."  *United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005) (quoting *O'Dell*, 805 F.2d at 640).  All elements must be satisfied.  *See Dell*, 805 F.2d at 641.

#### a.    **Timing of Discovery**

Both Maike and Hosseinipour assert that the evidence in the Trinity database was newly discovered.  As discussed above, Defendants clearly knew of the existence of the Trinity database and had the opportunity to obtain access to the database containing the "newly discovered" data upon which their motions are based before they were found guilty at trial.

#### b.    **Due Diligence**

Consistent with the analysis above, there is an absence of due diligence by Maike or Hosseinipour.  They were aware that the United States subpoenaed certain data from Trinity's database regarding I2G.  The trial record confirms that Defendants knew there was other data in

the database not included in the material subpoenaed by the United States.  While Maike asserts the United States' figure that 96% of participants lost money was due to "two mathematical or other errors that compounded on each other[,]" Defendants had ample opportunity to cross-examine Dr. Keep and Reynolds about Exhibit 101-I and its contents.  (Maike's Mot. 8).

The record also reflects a longstanding personal and business relationship between Reynolds and the Maikes.  The Court is skeptical of the argument that Reynolds would not have cooperated in providing data to assist Maike and Hosseinipour in defending against criminal charges arising out of their involvement with I2G.  While Maike and Hosseinipour note the alleged impediment of having to communicate through Reynolds' attorney, this does not mean that Reynolds would not have been cooperative towards them and their defenses—especially in light of the Maikes' long-standing relationship with Reynolds.  (Maike's Mot. 9).  Therefore, Maike and Hosseinipour have failed to show that they exercised due diligence.

### c.   Whether the Evidence Is Material, Not Merely Cumulative or Impeaching

For the motions to be granted, Maike and Hosseinipour must show that the newly discovered evidence is material rather than just cumulative or impeaching.  *See Jones*, 399 F.3d at 648 (citation omitted).  If they had this evidence at trial, this evidence could have been used to impeach Dr. Keep's opinions that I2G was a pyramid scheme and Reynolds' testimony as to the commissions paid to participants in the scheme.  As Reynolds testified during trial and the Sixth Circuit recognized in its decision, however, the extent to which participants lost money may have been overstated by Exhibit 101-I.  *See Maike*, 2025 WL 1770555, at *6.  While Maike and Hosseinpour could have used this evidence to show that fewer participants lost money, a jury could have still found that the scheme was fraudulent, that they knowingly and voluntarily

19

participated, and ultimately made millions in profit for themselves. Therefore, Maike and Hosseinipour have not shown that this new evidence would have been material at trial.

#### d. Likelihood of Evidence Resulting in an Acquittal

The final factor considers the likelihood that the introduction of the new evidence would have resulted in an acquittal at trial. *See Jones*, 399 F.3d at 648 (citation omitted). Maike and Hosseinipour are essentially arguing that their new evidence creates a conflict with the trial because only 63% of participants lost money, not 96%. However, "such conflicts do not amount to a likelihood of acquittal." *United States v. Seago*, 930 F.2d 482, 491 (6th Cir. 1991) (citing *United States v. Scaife*, 749 F.2d 338, 349 (6th Cir. 1984)). Because there is still overwhelming evidence that the organizers made millions while the vast majority of participants lost money to show that the scheme was fraudulent, Maike and Hosseinipour have failed to show that the introduction of the new evidence would have resulted in acquittal. *See id.* (citing *Scaife*, 749 F.2d at 349).

For these reasons, Maike and Hosseinipour have failed to meet their burden of proving that they are entitled to a new trial pursuant to Fed. R. Crim. P. 33(b)(2). Therefore, their motions are denied on this basis.

#### B. Hosseinipour's Motion for Leave to Seal

Hosseinipour moved for leave to seal her Motion for Evidentiary Hearing (DN 849) relating to her motion for a new trial (DN 856). (Def.'s Mot. Leave Seal 1, DN 848). She contends "that the pleading contains material which is deemed highly sensitive and confidential in nature." (Def.'s Mot. Leave Seal 1).

In relevant part, Joint Local Rule of Criminal Practice ("LCrR") 49.4 provides that "[p]arties and counsel should presume that all documents filed in district court should be

available for the public to access and that restricting public access can occur only in limited circumstances, as set forth in this Rule." LCrR 49.4(a). A motion for leave to seal "must state why sealing is required and must establish that the document sought to be filed under seal is entitled to protection from public disclosure." LCrR 49.4(c).

Courts have recognized that there is a "'strong presumption in favor of openness' as to court records." *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1180 (6th Cir. 1983)). When a party seeks to seal court documents, she bears the heavy burden of overcoming the presumption that the court filings should not be sealed. *See id.* "Only the most compelling reasons can justify non-disclosure of judicial records." *Id.* (quoting *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 476 (6th Cir. 1983)). Because a motion to seal must be narrowly tailored, "*[t]he proponent of sealing therefore must 'analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations.*'" *Id.* at 305-06 (emphasis added) (quoting *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002).

Overall, the motion is patently overbroad. It lacks sufficient justification to meet Hosseinipour's burden, or to comply with either LCrR 49.4 or Sixth Circuit precedent. She has failed to analyze whether it is appropriate to seal the motion (DN 849) or each of its attachments, and she did not provide specific reasons or legal citations in support of sealing each document. *See Shane Grp.*, 825 F.3d at 305-06.

Hosseinipour's motion for leave to seal (DN 849) contains no statements or information warranting the non-disclosure of its contents. Exhibit A (DN 849-1) is the Sixth Circuit's order in *United States v. Barnes*, Nos. 22-6121/23-5029 (6th Cir. Oct. 6, 2023), in which that Court released Hosseinipour on bond pending the resolution of her appeal. That order was not sealed

by the Sixth Circuit, and there is no valid reason for it to be sealed in this Court's docket—especially when an unsealed version of the document is already filed in the public record (DN 832).

Exhibit B (DN 852) is a conventionally filed CD containing the audio recording of the appellate oral argument, which was not sealed by the Sixth Circuit. It is improper to seal this recording, which may also be streamed from the Sixth Circuit's public website. *See* https://www.opn.ca6.uscourts.gov/internet/court_audio/audio/12-11-2024%20-%20Wednesday/22-6114%20USA%20v%20Richard%20Maike.mp3 (last visited Jan. 28, 2026).

Exhibit C (DN 849-3) is the unpublished annex of the Sixth Circuit's decision in *United States v. Maike*, Nos. 22-6114/22-6121/23-5029/23-5560/23-5561/23-5563 (6th Cir. June 26, 2025). Like the Sixth Circuit's order discussed above, the annex was not sealed. Besides being filed in the court record (DN 832), the annex can be found on Westlaw and Lexis. There is no legal basis for the unpublished annex to be sealed.

Exhibit D (DN 849-4) is an unsigned supplemental plea agreement proposed by the United States to Hosseinipour. The fact that the United States may have asked a defendant to consider cooperating is not a basis for sealing the document. Hosseinipour did not plead guilty; she was convicted by jury, and she therefore never signed any plea agreement or sealed supplemental plea agreement. In the absence of any specific reason or authority cited to support the request to seal this document, the motion is also denied as to this exhibit.

Finally, Exhibit E (DN 849-5) is a proposed order, which is required by LCrR 47.1(f). There is no valid basis for sealing this filing.

For these reasons, Hosseinipour's motion for leave to seal lacks merit and is not well-taken. This motion is denied.

22

## IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Defendants' Motions for New Trial (DN 847, 856) are **DENIED**.

2.    Defendant's Motion for Leave to Seal (DN 848) is **DENIED**.    The Clerk is directed to **UNSEAL** both DN 849 and 852 in their entirety.

**Greg N. Stivers, Judge**
**United States District Court**
March 20, 2026

cc:    counsel of record

23